UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEITH POLEE,<br><br>    Plaintiff,<br><br>    v.<br><br>CENTRAL CONTRA COSTA TRANSIT AUTHORITY (CCCTA),<br><br>    Defendant. | Case No. 18-cv-05405-SI<br><br>**ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND COSTS**<br><br>Re: Dkt. Nos. 77, 78 |

Now before the Court is plaintiff's motion for attorneys' fees and costs. For the reasons set forth below, the Court GRANTS plaintiffs' motion and awards fees and costs in the amount of $440,056.00, plus post-judgment interest on the judgment to be calculated pursuant to 28 U.S.C. § 1961(a).

**BACKGROUND**

**I.  Factual background**

On September 4, 2018, plaintiff Keith Polee filed this lawsuit against Central Contra Costa Transit Authority ("CCCTA"). Mr. Polee is African-American and had worked as a bus driver for CCCTA from 2007 until his termination in October 2017. Compl. ¶ 4. The complaint alleged that "[d]uring the time of plaintiff's employment, from time to time, African-American CCCTA bus drivers have witnessed and/or been subject to severe hostilities by certain passengers, including racial epithets and violent outbursts." *Id.* ¶ 7. The complaint alleged that CCCTA management was aware that incidents of racial hostility and abuse towards African-Americans had occurred on its busses, and that bus drivers had reported such incidents to management. *Id.* ¶ 8. The complaint

also alleged that despite such knowledge, CCCTA had failed to institute adequate policies and procedures designed to protect African-American employees and passengers from racial hostility and had failed to take reasonable measures to prevent and eradicate a hostile work environment, and that CCCTA retaliated against African-American employees who reported incidents of severe racial hostility. *Id*. ¶¶ 8-9.

In September 2017, Mr. Polee was driving a CCCTA bus and was exposed to several racial hostility by a passenger referred to as "Doe One." *Id*. ¶ 12. Doe One directed racial epithets at Mr. Polee and an African-American passenger, made several loud racist statements, and threatened to kill Mr. Polee. *Id.* ¶¶ 12-14. Plaintiff was deeply shaken by the incident and reported it to his supervisor. *Id*. ¶¶ 14-15. Plaintiff told his supervisor that as a result of the incident, it was impossible for him to work. *Id*. ¶ 16. Plaintiff's supervisor "removed plaintiff from service and involuntarily placed plaintiff on personal sick leave." *Id*. Plaintiff's supervisor did not offer him any accommodations or otherwise arrange for paid administrative leave. *Id*.

Several days later, plaintiff spoke to a different CCCTA manager about the incident and requested that CCCTA take action to prevent such incidents from happening. *Id*. ¶ 18. Plaintiff was informed to go to the police station and make a report. *Id*. At the police station, plaintiff was told it was unlikely that the police would investigate. *Id*. ¶ 19. Plaintiff returned to CCCTA and requested that CCCTA investigate the incident. *Id*. A manager told plaintiff that the incident would be investigated, and the manager placed plaintiff on administrative leave. *Id*.

Several weeks later, CCCTA sent plaintiff a notice of intent to terminate, placing him on a five day suspension without pay. *Id*. ¶ 20. The notice accused plaintiff of violating the attendance policy. *Id*. CCCTA terminated plaintiff on October 13, 2017. Plaintiff unsuccessfully challenged the termination. *Id*. ¶¶ 21-22.

The complaint alleges claims for wrongful termination and violation of public policy as well as violations of Title VII of the Civil Rights Act of 1964; the California Fair Employment and Housing Act ("FEHA"); the Americans with Disabilities Act, the Family Medical Leave Act; the California Family Rights Act of 1993; and the United States and California Constitutions.

## II. Procedural background

After the complaint was filed, the parties engaged in discovery, including written discovery and depositions. The parties attended three in-person settlement conferences on June 21, 2019, December 11, 2019, and February 14, 2020. On February 28, 2020, defendant made a Rule 68 offer of $250,000, which plaintiff accepted. Judgment was entered on March 10, 2020. After entry of judgment, the parties attempted to resolve plaintiff's claim for attorneys' fees, as well as issues related to payment of the settlement amount to plaintiff and other post-judgment issues. On July 2, 2020, defendant made a payment on the judgment. Dkt. No. 72. The parties were not able to resolve the matters of attorneys' fees or post-judgment interest, leading to the present motion for attorneys' fees and costs and post-judgment interest.

## DISCUSSION

Plaintiff seeks his reasonable attorneys' fees and costs pursuant to the fee-shifting provision in FEHA, Cal. Gov't Code § 12965(b), and the other fee-shifting state and federal laws upon which the complaint was based. Under California and federal law, courts use the "lodestar method" to calculate reasonable attorneys' fees. *See Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 551 (2010); *Chavez v. City of Los Angeles*, 47 Cal. 4th 970, 985 (2010). Under the lodestar method, the court calculates the fee by multiplying the number of hours reasonably expended by counsel by a reasonable hourly rate. *Id*.

As of the filing of the reply papers, plaintiff seeks the following: (1) merits fees of $373,269, based on a merits lodestar of $287,130 (337.8 hours multiplied by a 2020 hourly rate of $850, and 1.3 enhancement on the merits lodestar); (2) costs of $13,900; (3) post-judgment fees of $85,000 (100 hours multiplied by 2020 hourly rate of $850, no enhancement); and (4) post-judgment interest of $5,465.

Defendant does not dispute that plaintiff is the prevailing party and that he is entitled to his reasonable fees and costs. Instead, defendant argues that plaintiff's lodestar is unreasonable for a variety of reasons, including that the hourly rate sought is too high. Defendant also contends that a state-law multiplier is not warranted, and that the post-judgment interest should be calculated at a

3

different rate, resulting in a post-judgment interest award of $507.

**I.     Hourly Rate**

To determine whether counsel's hourly rates are reasonable, the Court looks to the "hourly amount to which attorneys of like skill in the area would typically be entitled." *Ketchum v. Moses*, 24 Cal. 4th 1122, 1133 (2001). "The fee applicant has the burden of producing satisfactory evidence, in addition to the affidavits of its counsel, that the requested rates are in line with those prevailing in the community for similar services of lawyers of reasonably comparable skill and reputation." *Jordan v. Multnomah Cty.*, 815 F.2d 1258, 1263 (9th Cir. 1987). Similarly, Civil Local Rule 54-5(b)(3) requires the party seeking a fee award to submit "[a] brief description of relevant qualifications and experience and a statement of the customary hourly charges of each such person or of comparable prevailing hourly rates or other indication of value of the services." The "party opposing the fee application has a burden of rebuttal that requires submission of evidence to the district court challenging the accuracy and reasonableness of the . . . facts asserted by the prevailing party in its submitted affidavits." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 978-79 (9th Cir. 2008).

Plaintiff's counsel Jeremy Friedman has submitted a declaration describing his qualifications and 33 years of experience specializing in employment discrimination, attorneys' fees, and false claims litigation. *See generally* Friedman Decl. (Dkt. No. 79). In his declaration, Mr. Friedman states that he has billed fee-paying clients for work performed in 2020, 2019, and 2017-2018 at then-current hourly rates of $850, $835, and $800, respectively. *Id.* ¶ 30. Mr. Friedman also discusses the factors and data that he uses to set his hourly rate, including prior cases in which he has been awarded his then-current hourly rates, as well as survey data showing growing billing rates in the Bay Area since 2010. *Id.* ¶¶ 33-35.

Plaintiff has also submitted the declarations of four Bay Area attorneys who practice in the areas of civil rights, employment discrimination and retaliation, attorney's fees, and false claims, and who attest to Mr. Friedman's experience, skill and reputation and the reasonableness of Mr. Friedman's hourly rate. *See* Havian Decl. ¶¶ 8-9 (stating that Friedman's $850 hourly rate "is well

within, if not below, the rates charged by attorneys in the private marketplace for work performed by attorneys with comparable skills and experience" and that he can "confirm that it is below the rate billed by Constantine Cannon attorneys with similar years of practice, and paid by fee-paying clients on a non-contingent basis.") (Dkt. No. 80); Sturdevant Decl. ¶¶ 8-9 (stating that he "periodically investigate[s] the hourly rates charged by and awarded to large and small firms throughout the Bay Area," "frequently work[s] with Richard Pearl and have used his declarations in cases which I handle concerning reasonable hourly rates," and that Friedman's hourly rate is "entirely consistent with the rates charged by my firm . . . and is consistent with the rates charged by my firm.") (Dkt. No. 81); Lawless Decl. ¶¶ 5-11 (stating, *inter alia*, that she "obtain[s] information concerning market rates from other attorneys in the area that have similar experience doing similar work, from information that occasionally appears in the local press and national bar publications, and in orders awarding attorney's fees in similar cases," "review[s] posting and communications from attorneys and other law firms regarding the hourly rates charged in the San Francisco Bay Area legal community for complex civil litigation," and Mr. Friedman's rate is "well within, if not below, the range of rates charged by attorneys with similar skills and experience to work on a non-contingent basis.") (Dkt. No. 82); Hirst Decl. ¶ 7 (stating he is "very familiar with the excellent skills, experience and reputation" of Friedman and that his hourly rate "is fair and reasonable, and well within what the market would pay for his services on a similar basis.") (Dkt. No. 83).

Defendant contends that Mr. Friedman's requested hourly rate is "considerably higher" than the Bay Area market "average" rate for "labor and employment attorneys." Def's Opp'n at 4 (Dkt. No. 85). As evidence, defendant cites two surveys. *See* Long Decl. & Exs. A & B (Dkt. No. 84-2). The first survey is the Peer Monitor Report, which is a subscription-based service provided by Thomson Reuters. Defense counsel states that on November 23, 2020, she ran a report to "request data on the market rates for Labor & Employment attorneys for the San Francisco market region" from January 2020 – October 2020, and that the report shows "the mean billable hourly rates for Labor & Employment attorneys in the San Francisco region to be $563 per hour for AmLaw 101-200 firms. For AmLaw 100 firms, the mean billable hourly rate increased to $719 per hour." Long

Decl. ¶¶ 4-5, 8 & Ex. A. The second survey cited by defendant is the Armanino Law Firm Compensation, Billing Rate & Benefits Survey from 2019 for San Francisco Bay Area attorneys. *Id.* Ex. B. That survey, which is based on responses from 18 Bay Area firms, shows that the average billable rate for "Labor & Employment" equity partners was $673/hour, with a median rate of $683/hour. *Id.*

The Court concludes that plaintiff has demonstrated that his requested rate of $850/hour is reasonable based upon his experience, skill, and reputation, and that it is within the prevailing market rates for the San Francisco Bay Area. As an initial matter, the Court notes that Mr. Friedman charged and was paid the 2020 $850/hour rate for work performed on a non-contingent basis. A court may consider an attorney's actual billing rate when determining a reasonable rate. *See White v. City of Richmond*, 713 F.2d 458, 461 (9th Cir. 1983), *disapproved on other grounds by Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 483 U.S. 711, 718 n.4 (1987); *see also Bolden v. J&R Inc.*, 135 F. Supp. 2d 177, 179 (D.D.C. 2001) ("An attorney's actual billing rate is presumptively deemed a reasonable rate, provided that the rate is 'in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'"). The declarations submitted by Mr. Friedman and the other attorneys demonstrate that Mr. Friedman's hourly rate of $850 is within the prevailing market rate for attorneys of comparable skill and experience practicing civil rights and employment discrimination law.

Defendant has not rebutted plaintiff's showing. The Peer Monitor Report shows mean billable hourly rates for "Labor and Employment" attorneys in the Bay Area, without any information about the attorneys' years of experience (or skill or reputation) or how many firms were surveyed. The Armanino survey contains somewhat more information about the experience of the attorneys in that it is limited to "equity partners." However, Mr. Friedman has 33 years of experience, and "equity partners" can encompass lawyers with a considerable range of experience, including far less than 33 years. *Cf. Gonzalez v. City of Maywood*, 729 F.3d 1196, 1206 (9th Cir. 2013) (holding district court erred by setting arbitrary hourly rates for plaintiff's attorneys by "disregarding the varied levels of skill, experience, and reputation among them."). In addition, the Armanino survey is from 2019, and based on only 18 responses.

In addition, it is not apparent from the scant information provided in both surveys that the hourly rates of "labor and employment" attorneys is probative of the prevailing market rates "for work that is similar to that performed in this case, by attorneys with the skill, experience and reputation comparable to that of [plaintiff's] attorneys." *Camacho*, 523 F.3d at 980-81; *see also Gonzalez*, 729 F.3d at 1206 (reasonable rate should be determined using market rate prevailing in the district for "attorneys and paralegals of similar 'experience, skill, and reputation' to members of Plaintiffs' legal team working on similarly complex matters."). The survey information provided by defendant does not contain any information about the nature of the "labor and employment" work included in the survey. In contrast, the declarations by Mr. Friedman and the other attorneys describe in detail the nature of Mr. Friedman's work in this case, Mr. Friedman's practice areas, and state that an hourly rate of $850/hour is within the prevailing market rates for Bay Area practitioners in the areas of civil rights and employment discrimination and retaliation.

Accordingly, the Court finds that plaintiff has established that Mr. Friedman's 2020 hourly rate of $850/hour is reasonable.

## II. Reasonable Hours

Under California law, "absent circumstances rendering the award unjust, an attorney fee award should ordinarily include compensation for *all* the hours *reasonably spent*, including those relating solely to the fee." *Ketchum*, 24 Cal. 4th at 1133. "[T]he trial court has broad authority to determine the amount of a reasonable fee." *PLCM Group v. Drexler*, 22 Cal. 4th 1084, 1095 (2000).

Plaintiff's counsel has submitted detailed time records showing the time spent on tasks in this case. *See* Friedman Decl. Exs. B-C (Dkt. Nos. 79-2, 79-3). Mr. Friedman's declaration also discusses the time he spent on different litigation tasks from the initial intake in May 2018 through the preparation of the fee petition. Friedman Decl. ¶¶ 14-21. These litigation tasks included, *inter alia*, preparing for and attending three settlement conferences; preparing for and attending case management conferences; drafting and responding to written discovery; taking and defending depositions; meeting and conferring over discovery disputes; retaining and conferring with experts regarding economic and psychological damages and obtaining a report from a workplace

7

investigation expert[1]; preparing for trial, including retaining a private investigator to assist with fact witnesses and trial issues and preparing expert; and post-judgment work pursuing payment of the judgment and attempts to resolve attorneys' fees. *See id.*

Defendant contends that Mr. Friedman spent too much time on this case. In support of that argument, defendant notes that Mr. Friedman, a solo practitioner, spent 339.8 hours between March 2018 and March 2020, while defendant's three lawyers collectively billed 310 hours. Def's Opp'n at 3, citing Martinez Decl. ¶ 12. The Court is not persuaded by that argument. As an initial matter, 339.8 vs. 310 hours is not a significant difference in the amount of time spent. In addition, defense counsel have not submitted their time sheets, and thus the Court cannot make any meaningful comparison between the time spent by plaintiff's counsel and defense counsel. More importantly, "opposing parties do not always have the same responsibilities under the applicable rules, nor are they necessarily similarly situated with respect to their access to necessary facts, the need to do original legal research to make out their case, and so on[,]" and thus "[c]omparison of the hours spent in particular tasks by the attorneys for the party seeking fees and by the attorney for the opposing party, therefore, does not necessarily indicate whether the hours expended by the party seeking fees were excessive." *Ferland v. Conrad Credit Corp.*, 244 F.3d 1145, 1151 (9th Cir. 2001). Plaintiff had the burden of proving his claims and his damages, and thus it is not surprising that plaintiff's counsel would have spent modestly more time than defense counsel on this case.

Defendant also objects to certain billing entries as duplicative or excessive. Def's Opp'n at 3-4. In response, Mr. Friedman has submitted a supplemental declaration addressing each of the identified billing entries and stating that none of the entries reflect duplicative or excessive time. Reply Friedman Decl. ¶ 3 (Dkt. No. 93). In addition, "to facilitate the resolution of this fee petition,

---

[1] Plaintiff has submitted the expert report of the workplace investigation expert, Amy Oppenheimer. Dkt. No. 79-1. In her report, Ms. Oppenheimer discusses evidence in the case, including the existence of a January 2016 CCCTA policy regarding how operators should respond to abusive passengers. Ms. Oppenheimer also states that plaintiff was not aware the policy and that there was no formal training program for operators about that policy. Ms. Oppenheimer opines that CCCTA did not adequately implement policies designed to protect employees from racial harassment (including by failing to train operators regarding the 2016 policy); that CCCTA's investigation into the incident was inconsistent with its own policies; that CCCTA's use of post-incident absences as a basis to terminate plaintiff was improper; and that CCCTA failed to take appropriate remedial measures after it became aware of the harassment.

an in addition to the prior billing judgment reductions and unrecorded productive time," Mr. Friedman has either stricken entire challenged time entries or made further reductions. Pl's Reply at 9-10; Reply Friedman Decl. ¶ 3. In light of these further reductions, defendant's objections to specific time entries are now moot.

Defendant also generally contends that plaintiff's counsel spent too much time post-judgment, although defendant does not challenge any particular time entries. The Court has reviewed counsel's post-judgment time entries (Dkt. No. 79-3), which show, *inter alia*, numerous communications with opposing counsel regarding payment of the judgment, legal research into enforcement of a judgment against a public entity in California, preparation of lengthy letters addressing attorneys' fees and costs (which were shared with Magistrate Judge Kim), attending a Zoom settlement conference and follow up calls and emails with counsel and Judge Kim, attending case management conferences with this Court, and preparation of the fee motion and supporting documents. Plaintiff's counsel has also made billing judgment deductions to the post-judgment time, deducting a total of 31 hours. The Court finds that plaintiff has demonstrated that on balance, this time was spent reasonably and necessarily, although the Court will deduct a total of 4 hours for time spent researching and litigating the question of whether the federal or state rate of interest applies (an issue discussed *infra*).[2]

Finally, defendant asserts some additional objections to the reasonableness of the hours spent, none of which are well-taken. Defendant objects that "there is nothing novel, difficult, or unique" about plaintiff's claims, asserting that this case lacked complexity and was "rather conventional." Def's Opp'n at 5-7. Relatedly, defendant asserts that plaintiff's "counsel did not assume exceptional risk or produce above average work because the case settled before extensive litigation was required." *Id.* at 7.

---

[2] Based upon the Court's review of counsel's billing records, six entries explicitly mention conducting legal research on interest and drafting letters to opposing counsel and responding to letters regarding interest, in addition to other tasks (5/15/2020, 6/8/2020, 6/22/2020, 7/6/2020, 8/3/2020, 8/4/2020). The Court recognizes that "interest" could include not just the question of the applicable rate, but also whether plaintiff was entitled to post-judgment interest, which apparently also was at issue for some period of time. Counsel also spent time briefing the issue in the motion and reply papers. Based upon the Court's assessment of the record, the Court concludes that a 4 hour deduction is appropriate.

9

The Court disagrees, and finds that plaintiff's counsel achieved an excellent result – a $250,000 settlement – for his client, as well as achieving a public benefit by providing CCCTA with a basis to better protect current and future employees against racial harassment on the job. This Court finds that this case was not straightforward and thus posed risks for plaintiff's counsel, as it presented the challenge of holding a public employer liable for incidents of racial harassment by non-employees, proving wrongful termination, as well as complexities regarding damages. Further, the record in this case – counsel's billing records, declarations, and the parties' joint case management conference statements – detail the considerable amount of litigation tasks performed by plaintiff's counsel, including significant discovery, work with experts, and work related to settlement conferences.

Finally, defendant's argument that plaintiff's fee request is unreasonable because it is higher than the client's recovery lacks merit and has been rejected by courts because "[u]nlike most private tort litigants, a civil rights plaintiff seeks to vindicate important civil and constitutional rights than cannot be valued solely in monetary terms." *City of Riverside v. Rivera*, 477 U.S. 561, 574 (1986). "A rule of proportionality would make it difficult, if not impossible, for individuals with meritorious civil rights claims but relatively small potential damages to obtain redress from the courts." *Id*. at 578. "In order to ensure that lawyers would be willing to represent persons with legitimate civil rights grievances, Congress determined that it would be necessary to compensate lawyers for all time reasonably expended on a case." *Id*.

### III.     Multiplier

Plaintiff seeks a 1.3 multiplier pursuant to California law for the time spent litigating the merits of this case. Plaintiff does not seek a multiplier for the time spent post-judgment. Plaintiff argues that a 1.3 multiplier is warranted to account for the contingent risk as well as the preclusion of other employment and results obtained. In his declaration, Mr. Friedman discusses the contingent risk of this case and the difficulties employees face in obtaining legal representation for race discrimination claims against former employers. *See* Friedman Decl. ¶¶ 36-42; *see also* Sturdevant Decl. ¶ 10; Havian Decl. ¶ 7; Hirst Decl. ¶ 8.

1    California law provides that while "the unadorned lodestar reflects the general local hourly
2    rate for a *fee-bearing case*; it does *not* include any compensation for contingent risk, extraordinary
3    skill, or any other factors a trial court may consider[.]" *Ketchum*, 24 Cal. 4th at 1138. "Once the
4    court has fixed the lodestar, it may increase or decrease that amount by applying a positive or
5    negative 'multiplier' to take into account a variety of other factors, including the quality of the
6    representation, the novelty and complexity of the issues, the results obtained, and the contingent risk
7    presented." *Laffitte v. Robert Half Int'l Inc.*, 1 Cal. 5th 480, 489 (2016); *see also Ketchum*, 24 Cal.
8    4th at 1132 (noting that court may also consider "the extent to which the nature of the litigation
9    precluded other employment by the attorneys"). "The purpose of such an adjustment is to fix a fee
10   at the fair market value for the particular action. In effect, the court determines, retrospectively,
11   whether the litigation involved a contingent risk or required extraordinary legal skill justifying
12   augmentation of the unadorned lodestar in order to approximate the fair market rate for such
13   services." *Ketchum*, 24 Cal. 4th at 1132. However, the Court "should not consider these factors to
14   the extent that they are already encompassed within the lodestar." *Id.* at 1138. For instance, "[t]he
15   factor of extraordinary skill . . . appears susceptible to improper double counting; for the most part,
16   the difficulty of a legal question and the quality of representation are already encompassed in the
17   lodestar. A more difficult legal question typically requires more attorney hours, and a more skillful
18   and experienced attorney will command a higher hourly rate." *Id.* at 1138-39. The party seeking a
19   multiplier bears the burden of proof. *Id.* at 1138.

20   Defendant contends that plaintiff is not entitled to a multiplier. To some extent, defendant's
21   arguments against a multiplier are repetitive of those asserted against the lodestar (such as asserting
22   that the case "was a non-complex, single-plaintiff case"), and for the same reasons the Court finds
23   that the arguments lack merit. In addition, plaintiff correctly notes that defendant's discussion of
24   the availability of a multiplier under federal law is misplaced because plaintiff is seeking a multiplier
25   under broader California fees law.

26   The Court concludes that plaintiff is entitled to an upward adjustment to account for the
27   contingent risk and preclusion of other work, as well as the results obtained, which as noted *supra*
28   consisted of a significant monetary award to a civil rights plaintiff as well as conferring a public

benefit. However, the Courts finds it appropriate to award a slightly lower multiplier of 1.2, in recognition of the fact that CCCTA is a public entity and because CCCTA did not engage in lengthy or protracted litigation, but instead settled prior to motion practice or trial. *See Serrano v. Priest (Serrano III)*, 20 Cal.3d 25, 49 (1977) (court may consider defendant's public entity status in determining fee); *cf. Horsford v. Board of Trustees of CSU*, 132 Cal. App. 4th 359, 400-01 (2005) (defendant's public entity status "is far less important, however, where the public entity intentionally engages in discrimination and chooses to defend its conduct through lengthy and complex litigation.").

Accordingly, the Court will apply a 1.2 multiplier to plaintiff's merits lodestar, for a total of $344,556.00.

**IV.    Costs**

Plaintiff seeks $13,900 in costs. Defendant does not oppose plaintiff's request for costs, and the Court finds that plaintiff is entitled to recover the costs sought.

**V.    Interest**

The parties agree that plaintiff is entitled to 114 days of interest on his judgment of $250,000 because the judgment was entered on March 10, 2020 and not paid until July 2, 2020. The parties dispute whether the applicable rate is set by federal or state statute. Plaintiff concedes that the federal rate as set forth in 28 U.S.C. § 1961 "usually applies to federal judgments," but asserts that this case is unusual because Federal Rule of Civil Procedure 69(a)(1) "requires plaintiff to rely on the unique California statute for enforcement of judgments against local public entities, restricting Mr. Polee to a writ of mandamus pursuant to Government Code § 970.1(c)." Pl's Reply at 16. Plaintiff contends that because plaintiff must rely on Government Code § 970.1(c) rather than the normal routes for enforcement, interest should be calculated under California law which provides for a higher rate than the federal rate.[3]

---

[3] 28 U.S.C. § 1961 provides that interest is calculated "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal

The Court agrees with defendant that 28 U.S.C. § 1961(a) provides the standard for calculating interest "on any money judgment in a civil case recovered in a district court." As defendant notes, Cal. Gov't Code § 970.1(c), upon which plaintiff relies, states, "*Unless another statute provides a different interest rate*, interest on a tax or fee judgment against a local public entity shall accrue at a rate . . . ." Here, the federal statute provides a different interest rate, and because the judgment was entered in federal court, 28 U.S.C. § 1961(a) applies.

## CONCLUSION

For the foregoing reasons, the Court GRANTS plaintiff's motion for attorneys' fees and costs as follows: (1) total merits fees of $344,556 (337.8 hours claimed at an hourly rate of $850, with a 1.2 multiplier); (2) post-judgment fees of $81,600 (96 hours at an hourly rate of $850); (3) costs of $13,900; and (4) post-judgment interest to be calculated at the federal rate as set forth in 28 U.S.C. § 1961, for 114 days.

**IT IS SO ORDERED**.

Dated: January 29, 2021

SUSAN ILLSTON
United States District Judge

---

Reserve System, for the calendar week preceding the date of the judgment." Plaintiff states the applicable federal rate is 0.65% annual and defendant states that the rate is 0.616% annual.